IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 79225-3-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| JEREMIAH JAMES PETLIG, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — The State accused Jeremiah Petlig of strangling his fiancée Serina Ann Teigen[1] and charged him with second degree assault with domestic violence allegations. A jury convicted him as charged. Petlig appeals, claiming that (1) the trial court erroneously admitted (a) certain statements he made to the arresting officer and (b) his jail phone calls, and (2) the State committed (a) governmental misconduct and (b) prosecutorial misconduct. He also submits a statement of additional grounds (SAG) and correspondence to this court in which he makes a number of claims. We affirm.

## I. BACKGROUND

Petlig and Teigen resided in their recreational vehicle (RV) outside a church. One summer evening, around 7:15 p.m., a passing driver flagged down Officer Roger Gale in his patrol vehicle after she witnessed Petlig fall on top of Teigen outside the RV, holding her from behind with his arms wrapped around

---

[1] An identification card admitted at trial shows that Teigen's last name now is Dick. But the parties and the Information call her Teigen, so we do as well.

Citations and pin cites are based on the Westlaw online version of the cited material.

her neck. Officer Gale approached Teigen and Petlig and asked them what happened. Petlig said that he had been trying to "fix some stuff," he had not choked Teigen,[2] and he had just been trying to get her to talk to him. Officer Gale decided to separate the two and detained Petlig in the back of his patrol vehicle. Officer Gale then took a statement from Teigen and observed a small cut on her neck and a bruise on her arm. Officer Gale returned to his vehicle, and Petlig volunteered that he was bleeding from his arm. Officer Gale asked Petlig how he had been injured. Petlig stated that he had gotten cut while working on the RV. Medics arrived and attended to Petlig and Teigen. Medics asked Petlig for his name and address.

After medics finished attending to Petlig, Officer Gale returned to Petlig, gave him Miranda[3] warnings, and took a statement from him. In response to Officer Gale's more extensive questioning about the incident, Petlig denied hitting Teigen and said that he grabbed her around the shoulders but did not choke her or put his hands on her throat. Officer Gale arrested Petlig.

The State charged Petlig with second degree assault with domestic violence allegations. Before trial, the State added four charges of violating a no-contact order based on phone calls Petlig made to Teigen while in custody. The trial court severed the assault charge from the no-contact charges. The trial court admitted Petlig's pre-Miranda statements except those made as a part of a custodial interview with Officer Gale and medics in the back of the patrol vehicle.

---

[2] Officer Gale had not asked whether Petlig had choked Teigen. It appears from the record that Petlig said this with no prompting.

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

2

The trial court admitted Petlig's post-Miranda statements. A jury convicted Petlig as charged. We discuss additional facts below as necessary.

## II. ANALYSIS

### A. Post-Miranda Statements

Petlig claims Officer Gale employed an improper two-step interrogation through eliciting statements before and after the Miranda warnings. He argues that the trial court thus erred by admitting his post-warning statements. The State counters that because the officer did not deliberately engage in a two-step interview process, the trial court did not err. We agree with the State.[4]

We review for abuse of discretion a trial court's evidentiary rulings. State v. Filitaula, 184 Wn. App. 819, 824, 339 P.3d 221 (2014). A trial court abuses its discretion by rendering a manifestly unreasonable ruling or basing its decision on untenable grounds or reasons. State v. Andrews, 172 Wn. App. 703, 708, 293 P.3d 1203 (2013).

Under the Fifth Amendment of the United States Constitution, police must provide a suspect with Miranda warnings before questioning. State v. Rhoden, 189 Wn. App. 193, 199, 356 P.3d 242 (2015). Courts must suppress prewarning statements made by a suspect in a custodial interrogation conducted by a State agent. Id.

But federal and state decisions likewise may require suppression of *postwarning* confessions if police procure a prewarning confession from a

---

[4] Alternatively, while the parties did not brief the issue, it appears Petlig may have waived this argument by not raising it below.

defendant in custody, provide Miranda warnings, and then procure another confession. Id. at 200 (citing Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004)). Courts call this procedure a "two-step interrogation." See, e.g., Rhoden, 189 Wn. App. at 199–200.

"[A] court addressing the admissibility of statements obtained during a two-step interrogation procedure must first determine whether the interrogating officer deliberately used the two-step procedure to undermine the effectiveness of Miranda warnings." Id. at 200–01. The inquiry into deliberateness:

> . . . does not require courts to evaluate the subjective intent of the interrogator. Rather, in determining deliberateness, "courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning." "Such objective evidence would include the timing, setting, and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre and postwarning statements."

Id. at 201 (internal citations omitted) (quoting United States v. Williams, 435 F.3d 1148, 1158–59 (9th Cir. 2006)).

In Rhoden, before giving Miranda warnings, police asked the defendant if he had any guns or drugs in his home. 189 Wn. App. at 196. The defendant confessed that police could find a small amount of drugs and at least one gun in his bedroom. Id. Police then took the defendant to another room, gave him Miranda warnings, and then asked "pretty much the same questions." Id. The defendant admitted that he had about a gram of methamphetamine in his bedroom. Id. Division Two of this court reasoned that "the objective evidence of 'the timing, setting and completeness of the prewarning interrogation, the

4

continuity of police personnel and the overlapping content of the pre and postwarning statements' all support[ed] the conclusion that the two-step interrogation procedure" was deliberate. Id. at 202 (quoting Williams, 435 F.3d at 1159).

Presumably because Petlig did not raise below the specific issue of the two-step interview procedure, the parties and the trial court did not purposefully develop the record on the question of deliberateness. Like the parties, we scan the record for pertinent information.

For this analysis, we assume—as the parties imply in their briefing—that the pre- and postwarning interviews in the back of Officer Gale's patrol vehicle constituted custodial interrogations. Since the two-step interview doctrine applies only to statements made in custodial interviews, we consider only statements that Petlig made while in custody. See Rhoden, 189 Wn. App. at 199–200 (applying the two-step interview doctrine to statements made in custodial interrogations). Indeed, Petlig's argument on this issue addresses only the statements he made while in the back of Officer Gale's patrol vehicle, and not the statements he made before Gale detained him.

Since Officer Gale conducted both the pre- and postwarning interviews in the back of his patrol vehicle, the questionings had continuity of setting and personnel. But as to whether their content overlapped, unlike in Rhoden, Officer Gale did not ask substantially the same questions. In the prewarning custodial interrogation, Officer Gale asked Petlig only how he had hurt his arm. After giving warnings, Officer Gale conducted a more complete interview: he asked

how Teigen had hurt her arm, whether Petlig had hit her, how Petlig had grabbed her, and asked about their relationship. As to the timing of the interviews, the postwarning custodial interrogation took place more than 30 minutes after the prewarning custodial interrogation, and not right after as in Rhoden. And no subjective evidence, such as testimony by Officer Gale, suggests that he deliberately conducted a two-step interview process. Given the above, we cannot conclude that the trial court abused its discretion in admitting Petlig's postwarning statements.

## B. Jail Phone Calls

Petlig argues the trial court erred in playing the jail phone calls to the jury. He claims this prejudiced him because it informed the jury that he was incarcerated while awaiting trial, and the calls suggested he is a violent and mendacious person. He also argues that other evidence already established that he and Teigen were in a relationship, the purported purpose for the admission of the calls.[5] The State claims Petlig waived these arguments and that if not, the trial court properly admitted the calls. We conclude that a portion of these arguments is waived, and that the trial court did not abuse its discretion in admitting the calls.

### 1. Waiver

At trial, Petlig objected to admission of the calls because they implicated his custody status. He makes the same argument on appeal. Petlig has not

---

[5] Since the State accused Petlig of a crime of domestic violence, the existence of Petlig and Teigen's relationship constituted an element of the charged crime. See RCW 10.99.020(6).

6

waived this particular argument.

But Petlig's briefing implies that his claims about the calls implicating him as a violent and mendacious person rest on ER 404(b) grounds. Petlig's trial brief moved generally to exclude any prior act evidence under ER 404(b). And Petlig points to a portion of the record where the trial court stated that it would consider whether the phone calls raised any ER 404(b) concerns. But he does not point to anything in the record where he made a specific objection to the phone calls on ER 404(b) grounds as required by ER 103(a)(1) and RAP 2.5(a), and the specific basis for his general objection is not apparent in context. See State v. Walker, 75 Wn. App. 101, 109, 879 P.2d 957 (1994) (an appellate court may consider the propriety of a ruling on a general objection if its specific basis is apparent in context). He did not argue to the trial court that the calls paint him as a violent or mendacious person. Petlig now argues that even if he did not object below on this ground, the admission of the calls constituted manifest constitutional error under the meaning of RAP 2.5(a)(3) since it deprived him off his opportunity for a fair trial. But "[a]n evidentiary error, such as erroneous admission of ER 404(b) evidence, is not of constitutional magnitude." State v. Powell, 166 Wn.2d 73, 84, 206 P.3d 321 (2009). Thus, Petlig waived his claim that the calls paint him as a violent and mendacious person.

2. Admission of the jail calls

Petlig argues that because two of the calls start with an automated message stating that the call is coming from a correctional facility, they improperly revealed his custodial status to the jury. Based on this court's

7

decision in State v. Mullin-Coston,[6] we conclude the trial court did not abuse its

discretion by admitting them.[7]

We review for abuse of discretion a trial court's evidentiary rulings.

Filitaula, 184 Wn. App. at 824. A trial court abuses its discretion if its decision is

manifestly unreasonable or based on untenable grounds or reasons. Andrews,

172 Wn. App. at 708.

Evidence of a defendant's prior acts is inadmissible to show their

propensity to commit the charged crime. State v. Fisher, 165 Wn.2d 727, 744,

202 P.3d 937 (2009). But ER 404(b) allows introduction of such evidence when

---

[6] 115 Wn. App. 679, 693, 64 P.3d 40 (2003).

[7] Even if we considered Petlig's other claim—that the trial court abused its discretion in admitting the calls because they elicit the inference that he is a high-risk, violent person, prone to lying—it would fail.

Petlig specifically points to two calls in support of his claim that the recordings suggest that he is a violent and mendacious person and thus were unfairly prejudicial. First, he points to a call between him and Teigen in which the two discuss the fact that Petlig had not been forthcoming about his previous romantic relationship with a mutual friend. Second, he points to a call in which he stated to Teigen that when the State is concerned with a defendant's capacity for violence—especially in a domestic violence case—they will typically put them in jail immediately. ("[I]f the State was so concerned about me being a high violent risk . . . then why did they wait a week and a half to file it?").

Petlig's reticence to admit he had a previous relationship with their mutual friend could be interpreted as somewhat prejudicial about his tendency to lie. But more so, the conversation shows that Petlig and Teigen considered themselves to be in a relationship, since their conversation regards Teigen's frustration, as Petlig's current partner, that he had not informed her of his previous relationship with their mutual friend.

As to the other call, Petlig, in making the comment about "high violent risk," appears to be discounting any categorization of himself as such. And elsewhere in the call, the two exchange "I love you," and Teigen states that "[she will] be better when [Petlig] gets home." The comment about "high violent risk" is, at most, minimally prejudicial, and the rest of the call establishes their relationship.

While other evidence also established a relationship between Petlig and Teigen, the admission of the calls was, at best, minimally prejudicial, and they went towards establishing the State's burden of proving beyond a reasonable doubt the elements of the charged crime. If considered, we would conclude the trial court did not abuse its discretion by admitting either call.

the court: (1) finds by a preponderance of the evidence that the acts actually occurred, (2) identifies the purpose of admitting the evidence, (3) determines the relevance of the evidence to prove an element of the crime, and (4) weighs the probative value of the evidence against its prejudicial effect. Id. at 745.

Although the trial court doubted whether ER 404(b) applied to the calls, it still conducted an ER 404(b) analysis. It found by a preponderance of the evidence that the calls occurred, that the purpose of the calls was to show a relationship between Petlig and Teigen, that the calls were relevant to that end, and that the risk of unfair prejudice did not outweigh the probative value of the calls. Id.

"[A]lthough references to custody can certainly carry some prejudice, they do not carry the same suggestive quality of a defendant shackled to his chair during trial." Mullin-Coston, 115 Wn. App. at 693. In Mullin-Coston, this court held admission of calls that implicated the defendant's custody status did not prejudice him. Id. at 693–95.

Two calls played to the jury began with an automated message stating that the person placing the call is an inmate at King County Correctional Facility. Both calls are relevant in establishing a relationship between Petlig and Teigen.[8] Petlig does not suggest that these calls were any more prejudicial than the calls in Mullin-Coston. The court in Mullin-Coston rejected the defense's analogy between such calls and visible physical measures of restraint. Id. at 693–94.

_____

[8] In the call, Petlig encourages Teigen to tell the court that she wants charges dropped and instructs her on use of a shared vehicle. The two also exchange the statement, "I love you."

9

Petlig points to no decision suggesting that admission of calls that implicate a defendant's custodial status may constitute abuse of discretion.

Other evidence also establishes a relationship between Petlig and Teigen, but the State bears the burden of establishing beyond a reasonable doubt the elements of the assault charge. And under Mullin-Coston, admission of such calls is not necessarily prejudicial. We conclude that the trial court did not abuse its discretion by admitting either call.

### C. Governmental Misconduct

Petlig claims the State mismanaged discovery at trial by delaying in informing him which jail phone calls it would offer at trial, and by delaying in offering a copy of Teigen's identification (ID) card. Petlig argues the trial court failed to provide an adequate remedy for the government's mismanagement of discovery, such as suppression of the evidence or dismissal of the case. The State argues Petlig has not shown governmental misconduct or prejudice. We conclude that the alleged misconduct did not lead to prejudice.

If a defendant shows, by a preponderance of the evidence, (1) arbitrary action or governmental misconduct that (2) prejudicially affects their rights to a fair trial, a court may dismiss their charges. CrR 8.3(b); State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2008). Such dismissal requires a showing of actual prejudice. Id. at 658. We review a ruling on a motion to dismiss under CrR 8.3(b) for manifest abuse of discretion. State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Id.

Under CrR 4.7(a)(1), the State must provide the defendant, prior to the omnibus hearing, any recorded statements of the defendant and any documents it plans to rely on at trial. Governmental misconduct includes violation of CrR 4.7 discovery rules. State v. Salgado-Mendoza, 189 Wn.2d 420, 433 403 P.3d 45 (2017). Possible sanctions for mismanagement of discovery include a continuance,[9] suppression of the evidence in question,[10] and even outright dismissal of the charges.[11] We review a ruling on a request for any such sanction for abuse of discretion. State v. Ruelas, 7 Wn. App. 2d 887, 896, 436 P.3d 362 (2019).

"Delayed disclosure may support a finding of governmental misconduct. Misconduct occurs when the prosecutor 'inexcusably fails to act with due diligence,' resulting in material facts not being disclosed 'until shortly before a crucial stage in the litigation process.'" Salgado-Mendoza, 189 Wn.2d at 433 (internal citation omitted) (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)).

1. Delayed disclosure of phone calls

The State provided Petlig with recordings of his jail phone calls in two batches in March and May 2018. In May 2018, Petlig, through his counsel, informed the trial court that the State had not yet informed him which calls it

---

[9] State v. Hutchinson, 135 Wn.2d 863, 881, 959 P.2d 1061 (1998) ("[CrR violations] are appropriately remedied by continuing trial to give the nonviolating party time to interview a new witness or prepare to address new evidence.").

[10] Id. at 881–82 ("Exclusion or suppression of evidence is an extraordinary remedy and should be applied narrowly").

[11] Id. at 881 ("Where the State's violation of [CrR 4.7] is serious, mistrial or dismissal may be appropriate.").

planned to offer at trial, and claimed the nondisclosure affected his ability to prepare for trial. The State did not so inform Petlig until August 2, 2018, and the State played the calls for the jury on August 8, 2018. After disclosure, Petlig did not object on this ground; he did not argue the State had committed misconduct by delaying in informing him which calls it would use at trial or argue that the late disclosure affected his ability to prepare for trial. It does not appear Petlig moved for any sanction because of the delay; he points to no court ruling on this matter.[12]

Despite Petlig's complaint in May that the State had not yet informed him which calls it planned to use at trial, the State did not provide this information until August 2, six days before trial. But even if this delay in disclosure constituted misconduct, Petlig fails to articulate how the delay caused him prejudice. That Petlig, after disclosure, declined to argue that the delay prevented him from adequately preparing for trial also elicits the inference that the delay did not cause prejudice. Thus, the trial court did not abuse its discretion by failing to impose the sanctions Petlig now requests.

2. Delayed disclosure of Teigen's ID card

The State originally submitted a version of Teigen's ID card that named her as Serina Ann Dick, and not Serina Ann Teigen, as the Information and Amended Information name her. The State acknowledged its mistake at the time of admission and explained that it would seek to also admit a copy that named

---

[12] While the parties do not brief this issue, it appears Petlig may have waived this claim. See RAP 2.5.

her as Serina Ann Teigen. The State eventually admitted the proper ID card. Petlig moved to dismiss the charges against him because of the late disclosure, which motion the trial court denied.

Although the delay in admitting the proper ID card may not have occurred because of the State's willful misconduct, "governmental misconduct need not be of an evil or dishonest nature; simple mismanagement is sufficient." Blackwell, 120 Wn.2d at 831. But Petlig again fails to show how any claimed misconduct led to prejudice. Petlig and his counsel knew that Teigen and Dick were the same person and knew that the State would eventually seek to admit an ID with a name that matched the charging documents so that Officer Gale could identify Teigen, since she was unlikely to testify.

Because Petlig fails to articulate, beyond bare assertions, how either claim of governmental misconduct prejudiced him, he does not show an abuse of discretion by the trial court.

D. Prosecutorial Misconduct

Petlig argues the State committed prosecutorial misconduct before the jury by: (1) asking questions suggesting Petlig presented too much of a danger to be let out of custody, (2) asking Officer Gale whether he had an interest or personal stake in the outcome of the case, (3) making arguments that denigrated defense counsel, and (4) trying to shift the burden of proof to Petlig and arguing facts not in evidence. The State argues no prosecutorial misconduct occurred, and assuming it did, Petlig did not suffer prejudice. We reject Petlig's claims.

13

To show prosecutorial misconduct, "the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). The defendant must prove "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" Thorgerson, 172 Wn.2d at 442–43 (alteration in original) (quoting Magers, 164 Wn.2d at 191). "The 'failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" Thorgerson, 172 Wn.2d at 443 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). Defense counsel's failure to object to allegedly improper remarks made by a prosecutor "*strongly suggests* to a court that the argument or event in question did not appear critically prejudicial to [the defendant] in the context of the trial." State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (internal quotation marks omitted) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)). "'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting State v. Brett, 126 Wn.2d 136, 174–75, 892 P.2d 29 (1995)).

1. Questions regarding domestic violence calls

Petlig argues the State committed prosecutorial misconduct by asking Officer Gale questions about the relative danger of domestic violence calls since

this, along with the jury's discovery through other means that Petlig was in custody awaiting trial, created the impression that Petlig is dangerous.[13]  Petlig objected to a portion of this line of questioning on grounds of relevance, which objection the trial court sustained.  But Petlig did not object on grounds of prosecutorial misconduct.

Measures that *single out a defendant* as particularly dangerous, such as physical restraint or shackling, threaten the defendant's constitutional right to a fair trial.  Mullin-Coston, 115 Wn. App. at 692–94.  While the jury knew Petlig was in custody and had been charged with a domestic violence offense, Officer Gale did not testify about Petlig's individual dangerousness, only to the danger of domestic violence calls in general.  And the State did not ask Officer Gale about Petlig's individual dangerousness.  Petlig has not met his burden of demonstrating these questions were either improper or prejudicial.  And he does

---

[13] From the State's examination of Officer Gale:

[State]: When you are either dispatched or engaged by a citizen to respond to a domestic violence crime, do you behave a little bit differently than you would with the typical dispatch like to the loose animal situation?

[Officer Gale]: Traditionally, domestic violence calls are inherently more dangerous, not only to the persons involved in the situation, but also to the officers.  By definition, domestic violence means it's a violent situation . . .

[Objection by Petlig on grounds of relevance and of mischaracterization of the law, court sustains the relevance objection.]

[State]: As far as a domestic violence call is concerned, is this a factor that you're always going to be dealing with as far as a call, such as the amount of people that would be involved in a situation for a DV call?

[Officer Gale]: For it to be a DV call, it would require at least two subjects in some kind of verbal or physical confrontation, so we already have two people with possibly heightened emotions, and I'm putting myself in the middle of that.

[State]: Gotcha.  And as a police officer, is this part of your calculus when you're entering that kind of situation?

[Officer Gale]: Yes.

not argue that this line of questioning was so flagrant and ill-intentioned that the resulting prejudice could not have been alleviated with a curative instruction to the jury. We conclude this did not constitute prosecutorial misconduct.

2.   Questions regarding Officer Gale's interest in the case

Petlig argues the State improperly bolstered Officer Gale's testimony by asking the officer whether he had a personal stake or interest in the outcome of the trial.[14] Petlig objected to this line of questioning on the ground it constituted bolstering; the trial court overruled his objection to the State's final construction of this question.

The State may not bolster an officer's good character. State v. Jones, 144 Wn. App. 284, 293, 183 P.3d 307 (2008) (holding that the State bolstered an officer's good character by referring to his integrity and honesty). But even if this line of questioning constituted improper bolstering of Officer Gale's honesty, Petlig does not attempt meet his burden of showing this error was prejudicial.[15] The trial court did not abuse its discretion in denying Petlig's objection.

3.   Arguments denigrating defense counsel

Petlig argues that by stating defense counsel mischaracterized the

---

[14] The prosecutor asked Officer Gale these questions: "Do you have any personal stake in the outcome of this case?" and, "Aside from wanting to do your job well, do you have any personal stake in the outcome of this case as to whether or not this jury finds [Petlig] guilty?"

[15] We also note that in the cases cited by Petlig regarding bolstering, the State made bolstering comments in closing argument, and not, as here, solely in its examination of a witness. See State v. Smith, 67 Wn. App. 838, 841–42, 841 P.2d 76 (1992); see also Jones, 144 Wn. App. at 292–93.

evidence, the State improperly denigrated defense counsel.[16] The State argues this was not improper, notes that Petlig did not object to it at trial, and thus argues he has not shown the statement was so ill-intentioned and flagrant as to deprive Petlig of a fair trial.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." Thorgerson, 172 Wn.2d at 451. In Thorgerson, the State repeatedly referred to certain aspects of defense counsel's argument as "bogus" and "sleight of hand." Id. at 451-52. Our Supreme Court concluded this constituted ill-intentioned misconduct but declined to reverse because a curative instruction would have alleviated any prejudicial effect of the statements. Id. at 452. As in Thorgerson, Petlig made no objection on this ground. Assuming the State's conduct here likewise constituted ill-intentioned misconduct, the trial court could have also alleviated the prejudicial effect of the State's single offhand comment that defense counsel mischaracterized the evidence with a curative instruction. We reject this claim.

4. Shifting the burden of proof to Petlig, arguing facts not in evidence

Petlig argues that when the State claimed in its closing rebuttal argument that the reason the jury had not heard from the paramedics was because Teigen did not sign a waiver, it improperly shifted the burden of proof and argued facts not in evidence. Petlig objected to this at trial.

---

[16] During closing argument, the prosecutor said, "I can't address every mischaracterization of the evidence that [defense counsel] discussed with you."

A prosecutor cannot argue facts not in evidence.  State v. Perez-Mejia, 134 Wn. App. 907, 916, 143 P.3d 838 (2006).  But before the State mentioned that Teigen had not signed a medical waiver, Officer Gale testified as such, so the facts were in evidence.  Thus, the State did not shift the burden of proof to Petlig.  We conclude this argument was not improper and that the trial court did not abuse its discretion in overruling Petlig's objection.

E.  Cumulative Error

Petlig argues the cumulative effect of the errors in his case require reversal of his conviction and a new trial.  "The cumulative error doctrine applies only when several trial errors occurred which, standing alone, may not be sufficient to justify a reversal, but when combined together, may deny a defendant a fair trial."  State v. Hodges, 118 Wn. App. 668, 673–74, 77 P.3d 375 (2003).  Petlig identifies only one possibly prejudicial error—the State's denigration of defense counsel.  And as discussed above, this error does not warrant reversal.  His cumulative error claim fails.[17]

F.  SAG and Correspondence with the Court

In his SAG, Petlig raises three issues related to the fact that Teigen did not testify at trial.  Separately, in correspondence filed with our court, he claims the State did not provide him with Brady[18] material and makes more confrontation clause claims.  None of these claims warrant reversal.

---

[17] The State also argues that if admission of Petlig's jail calls and late admission of Teigen's ID card constituted error, the errors were harmless.  But since these did not constitute prejudicial error, we do not reach the issue of harmless error.

[18] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

1.  SAG

First, Petlig points to a pretrial discussion between court and counsel about a transcript of a conversation between Teigen and a victim advocate. The State represented that nothing in the conversation qualified as exculpatory to trigger a Brady obligation to share it with the defense. From such, Petlig argues that CrR 4.7 requires the State to share not only exculpatory material with the defendant, but a broad range of other material as well. Petlig does not explain which material the State should have shared with him and makes no citation to legal authority in support of his argument. We need not consider argument made without citation to legal authority. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (arguments not supported by legal authority need not be considered).

Next, Petlig argues that because Teigen did not testify, any evidence about her constitutes inadmissible hearsay and the court should suppress it. He claims that the only instance in which the hearsay rule allows admission of such evidence is when the victim is deceased. None of the legal authorities cited by Petlig establishes that we must suppress all evidence related to Teigen because she did not testify. And Petlig makes no argument about any specific admitted evidence.

Finally, Petlig argues the State improperly bolstered Teigen's testimony by stating to the trial court in an *in camera* discussion that Teigen's conversation with the victim advocate gave him no reason to doubt her credibility. But the State was referring to its obligations to share any exculpatory material, Petlig

19

does not show a point in the record where the State bolstered Teigen in the presence of the jury, and Teigen did not testify. Nor does Petlig's discussion of this claim mention legal authority. See Cowiche, 118 Wn.2d at 809. We need not consider it.

The issues raised in Petlig's SAG do not warrant reversal.

2. Correspondence with the court

We do not typically consider an argument unless the defendant submits it in briefing or a SAG. RAP 10.1, 10.7, 10.10. But even if we treat these arguments as part of Petlig's SAG, they do not warrant reversal.

Before trial, Petlig sent a letter to our court. In it, he claimed the State had shared no Brady material with him, and that the State acted vindictively and committed misconduct. As to Petlig's first claim, he does not specifically assert which evidence the State should have shared with him. And we are "not obligated to search the record in support of claims made in a defendant/ appellant's [SAG]." State v. O'Connor, 155 Wn. App. 282, 293, 229 P.3d 880 (2010). And as to his second argument, he submits only a handwritten "copy" of email correspondence between the State and his trial counsel to support his claim of vindictiveness. But on direct appeal, we cannot consider allegations resting on matters outside the record. See State v. Kinzle, 181 Wn. App. 774, 786, 326 P.3d 870 (2014).

After trial but before sentencing, Petlig sent another series of letters to our court. In them, he makes numerous citations to legal authority, but only these claims connect law to fact in a discernible manner: (1) admission of any of

Teigen's statements violates the confrontation clause and due process clause; (2) the trial court violated his right to a speedy trial, and (3) that the State fabricated evidence by coaching a witness into showing that Petlig grabbed Teigen with a chokehold.  As to his first claim, he does not take issue with any specific admission, and we need not search the record in support of claims he makes.  See O'Connor, 155 Wn. App. at 293.  Nor does he cite the record in support of his second claim and, again, we need not search the record in support of it.  Id.  And finally, Petlig offers no factual support for his claim that the State fabricated evidence.

We affirm.

_Chun, J._

WE CONCUR:

_Andrus, A.C.J._    _Appelwick, J._